## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **No. 09-20468-A/P** |
| **EMILIO RIVAS,** | ) |
| **ANIBAL FIGUEREDO-DIAZ, and** | ) |
| **DARIO MORALES-LOYA,** | ) |
| | ) |
| **Defendants.** | ) |

---

### REPORT AND RECOMMENDATION

---

Before the court by order of reference are the following motions: (1) defendant Emilio Rivas's Motion to Suppress (D.E. 107); (2) defendant Anibal Figueredo-Diaz's Motion to Suppress (D.E. 98); and (3) defendant Dario Morales-Loya's Motion to Suppress and Amended Motion to Suppress (D.E. 76, 95). The United States filed a response in opposition to each of the motions. The court held a suppression hearing on all motions. At the hearing, the court heard testimony from Drug Enforcement Administration ("DEA") Task Force Officer Joe Hoing and Olive Branch Police Department Patrol Officer Mike Gibbs. The court also admitted into evidence fourteen photographs and one copy of a lease signed by Morales-Loya. At the conclusion of the

hearing, the court granted the defendants' joint motion to file post-hearing briefs.

Based on the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that each of the Motions to Suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

As an initial matter, the court finds the uncontradicted testimony of the government's witnesses to be credible and therefore accepts as fact the officers' version of the events.

On November 5, 2009, DEA Task Force Officer Joe Hoing received information from a confidential informant that Emilio Rivas had purchased a one-way plane ticket from McAllen, Texas to Memphis, Tennessee.  The informant – who in the past had provided Officer Hoing with reliable information about criminal activities on "many, many" occasions – stated that Rivas had booked the ticket the day before, that he would be arriving in Memphis at around 9:00 a.m on November 5, and that he paid for the ticket in cash on the same day as the flight.  At around 8:30 a.m on November 5, Officer Hoing arrived at the Memphis International Airport.  At approximately 9:00 a.m., he observed Rivas deplane a Continental Airlines flight arriving from McAllen (via a connection flight in Houston).  Rivas was carrying a backpack and had two cell phones, but had no luggage.  While maintaining

-2-

surveillance on Rivas, Officer Hoing used his cell phone to dial the cell phone number Rivas had given the airline and observed Rivas answer his phone in response to the call.   Officer Hoing testified that, based on his many years of experience and training in narcotics investigations, the purchase of a one-way ticket from a source city, the making of reservations shortly before a flight, the payment for the plane ticket in cash on the same day as the flight, and the use of multiple cell phones were facts consistent with someone engaging in drug trafficking.[1]

Officer Hoing then observed Rivas proceed to a ticket counter to speak to an airline employee.   Officer Hoing stood close to Rivas and could hear that he was fluent in English. Officer Hoing, as well as other DEA Task Force Officers who were assisting in the surveillance, closely followed Rivas as he walked out of the airport, entered a taxi, and traveled to the Kettle Restaurant on Brooks Road in Memphis.   At the restaurant, the officers observed Rivas exit the taxi and walk over to a

---

[1]Prior to becoming a DEA Task Force Officer, Officer Hoing was employed by the Memphis Police Department for thirty-three years. He has conducted numerous investigations into violations of the narcotics laws, ranging from simple possession of narcotics to complex international conspiracies.   He is familiar with the operation of illegal drug trafficking organizations and the methods used to import and distribute narcotics.   He also has expertise in monitoring drug trafficking through air travel and has conducted "hundreds" of investigations into drug trafficking at Memphis International Airport.

tractor trailer which was parked in the restaurant's parking lot. The tractor trailer was occupied by an individual later identified as Anibal Figueredo-Diaz, who was sitting in the front passenger's seat. Rivas climbed into the driver's seat of the tractor trailer, which had a Texas license plate. The officers checked the plate and determined that the tractor was registered to Rivas, while the trailer was registered in someone else's name. Figueredo-Diaz then exited the tractor trailer and, while talking on his cell phone, walked to a nearby gas station. At that time, Rivas also exited the tractor, walked to the back of the trailer, and conducted a visual inspection of the undercarriage of the trailer. Rivas then walked to the edge of the parking lot and began talking on his cell phone. A short time later, a black Chevrolet Blazer with a Mississippi license plate and driven by a man later identified as Dario Morales-Loya pulled into the parking lot. Rivas got into the Blazer and exited the parking lot, with the tractor trailer driven by Figueredo-Diaz following closely behind.

The officers followed the vehicles as they traveled to a Pilot truck stop on Highway 78 in Memphis. Morales-Loya drove the Blazer across the front of the parking lot of the truck stop and then headed southbound towards the Mississippi state line, while Figueredo-Diaz drove to the back of the truck stop and

parked the tractor trailer. DEA Task Force Officer Dan Jones remained at the truck stop to maintain surveillance on Figueredo-Diaz and the tractor trailer, while Officer Hoing and others followed the Blazer into Mississippi.[2]

The Blazer eventually arrived at a property located at 7116 Old Highway 78 in Olive Branch, Mississippi ("Old Highway 78 property").[3] Officers Hoing and Eric Hill conducted surveillance from across the street. The officers could see that at the front entrance of the property there was a metal chain-link gate supported by two metal polls. A "Beware of Dog" sign was affixed to the front of the gate, although there were no guard dogs on site. The chain-link gate stood by itself without any fencing to the left or right of the gate. Other than this stand-alone gate, there were no other barriers across the front of the property. The gate did not obstruct access to the driveway or other structures on the property. Although there was some metal fencing on the sides of the property, Officer Hoing testified

---

[2]Upon leaving the truck stop, Officer Hoing contacted the Olive Branch Police Department to notify them that the suspects were entering Olive Branch's jurisdiction. Officer Hoing also advised the Oliver Branch police that he would need uniformed support.

[3]Officer Hoing later obtained a copy of the lease to this property. The lease indicated that the property was being rented to Morales-Loya from the property owner, Brown Land Investment. The lease described the premises as a "Shop and Office."

that the lot was "not completely fenced in." The driveway and structures on the property were clearly visible to the officers and anyone on the road.

Morales-Loya pulled into the driveway on the property and pulled up to the front of a warehouse. Morales-Loya and Rivas exited the Blazer, opened the doors to the warehouse, and went inside. Shortly thereafter, they walked out of the warehouse and walked through the side door of a small house located directly adjacent to the warehouse.[4] A few minutes later, an unidentified man arrived on the property in a white Buick with a Mississippi license plate. The officers checked the Buick's registration and discovered that the vehicle was registered to someone named "Simon Loya" of Horn Lake, Mississippi. Officer Hoing immediately recognized the Loya name, as he had been involved in a long-term narcotics investigation of several individuals with the last name of Loya in the Memphis and northern Mississippi area. Specifically, in August of 2004, Officer Hoing participated in a DEA controlled delivery of over 1,000 pounds of marijuana to a business associated with the Loyas in Southaven, Mississippi. That transaction involved a tractor trailer

---

[4]Although Officer Hoing referred to the small structure as a "house" in his report, he testified at the hearing that the structure could have been either a house or an office, but that it was, in fact, uninhabited and vacant.

delivering marijuana to a warehouse. Also, in June of 2007, Officer Hoing participated in a DEA investigation and seizure of over 1,500 pounds of marijuana from a person named Guadalupe Loya.

The unidentified man entered the house, and then all three men walked out of the house. Rivas and the unidentified man entered the Buick and drove back to the Pilot truck stop. The Buick pulled up next to the tractor trailer occupied by Figueredo-Diaz. The Buick, followed by the tractor trailer driven by Figueredo-Diaz, left the Pilot truck stop and traveled back to the Old Highway 78 property. Figueredo-Diaz pulled up to the driveway in front of the warehouse and attempted to back up the tractor trailer to the warehouse. Rivas was apparently not satisfied with Figueredo-Diaz's attempts to back up the tractor trailer, so he proceeded to take over as the driver. Rivas managed to park the tractor trailer in the driveway, in close proximity to the warehouse. Officer Hoing could see that the front of the tractor trailer was only "two car-lengths" from the highway. Rivas exited the tractor trailer and joined Morales-Loya, Figueredo-Diaz, and the unidentified man at the rear of the trailer. Both rear doors of the trailer were open.

By that time, six to eight armed officers had arrived on the scene, all dressed in police gear and bullet-proof jackets. On

Officer Hoing's signal, the officers approached the four men with guns drawn and verbally announced their presence as "police." Morales-Loya complied and was ordered to the ground, and Figueredo-Diaz, who apparently did not immediately comply, was pushed to the ground. Both were immediately handcuffed by the officers. Rivas and the unidentified man, however, fled the scene and headed towards the wooded area at the rear of the property. Officer Hoing and other officers searched for the two fleeing suspects, and with the assistance of two helicopters, the officers were able to apprehend Rivas more than an hour later. The unidentified man who had fled with Rivas was never found.

While Officer Hoing was away from the scene in pursuit of Rivas, other officers remained on the property holding Figueredo-Diaz and Morales-Loya in custody. Officer Mike Gibbs of the Olive Branch Police Department arrived on the scene and, with his narcotics-detection canine "Marco," walked around the vehicles on the property, which included the tractor trailer, the Blazer, the Buick, and a van parked inside the warehouse. Although Marco alerted to the scent of narcotics in the Blazer, Buick, and van, a search of those vehicles did not uncover any physical evidence of narcotics.

While walking around the tractor trailer, Marco alerted to the scent of narcotics underneath the front of the trailer, near

the section where the trailer connected to the tractor. The officers cut the lock on the back of the trailer, but their search of the inside of the trailer did not uncover any narcotics. Officer Hoing, who by this time had returned to the property, walked his own narcotics-detection canine "Tex" around the tractor trailer. Tex stopped near the front of the trailer and alerted at the trailer's steel floor. Officers then drilled the trailer floor and discovered a large quantity of marijuana hidden in the insulation space inside the trailer's undercarriage. The officers recovered over 2,000 pounds of marijuana from the trailer's hidden compartment and seized $12,000 in cash from the sleeper compartment of the tractor. Several items, including receipts, statements, cards, a medical examiner certificate, and a passport, all belonging to Figueredo-Diaz, were found in the tractor portion of the vehicle.

Rivas, Morales-Loya, and Figueredo-Diaz were arrested and transported to the Memphis DEA office. The defendants were orally advised of their <u>Miranda</u> rights. Officer Hoing testified that "Spanish-speaking persons" were present to advise the defendants of their <u>Miranda</u> rights in Spanish. Each of the defendants indicated they understood their rights. Rivas gave a statement to the officers and explained that the truck belonged to him but that the tractor belonged to individuals who had hired

him for a fee of $15,000 to transport 1,000 pounds of marijuana to Memphis.  When the officers told Rivas that the actual amount of marijuana recovered was well over 2,000 pounds, Rivas became upset because he felt he had been cheated by the persons who had hired him.

The defendants were later indicted on one count of conspiring to possess with the intent to distribute and to distribute at least 100 kilograms of marijuana, in violation of 21 U.S.C. § 846, and one count of possessing with the intent to distribute at least 100 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1).  The defendants now move to suppress all evidence recovered during the search of the tractor trailer. Rivas also argues that his post-<u>Miranda</u> statement to the officers should be suppressed because it was obtained as a result of the unlawful detention and search.

## II.  PROPOSED CONCLUSIONS OF LAW

**A.  <u>The Officers' Presence On The Property</u>**

As a threshold matter, the court finds that by coming onto the Old Highway 78 property, the officers did not violate the defendants' Fourth Amendment rights.  With respect to Rivas and Figueredo-Diaz, the evidence demonstrates that, at most, they were on the property to conduct an illegal business transaction. <u>See</u> <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998).  There is no

-10-

evidence that the property was ever used by any of the defendants as a dwelling place, and in any event, there is no suggestion that either Rivas or Figueredo-Diaz was ever an overnight guest. Id. at 90-91. Because these two defendants lacked any expectation of privacy as to the Old Highway 78 property itself, they cannot contest the officers' presence on the property.

With respect to Morales-Loya, there is no evidence that he resided at the property or ever stayed overnight, and as Officer Hoing testified, the house appeared to be vacant and uninhabited. The lease signed by Morales-Loya described the property as a "Shop and Office." "Simply leasing a premises and possessing a key does not create a reasonable expectation of privacy." United States v. Jeffries, No. 3:07CR25-S, 2008 WL 90025, at *1 (W.D. Ky. Jan. 8, 2008). In any case, even assuming, arguendo, that Morales-Loya had a reasonable expectation of privacy in the vacant house or warehouse (which he did not), any purported expectation of privacy would not extend to the driveway area – the location where the tractor trailer was parked and where the drugs and money were seized. A driveway of a home "'is only a semi-private area.'" United States v. Pineda-Moreno, 591 F.3d 1212, 1215 (9th Cir. 2010) (quoting United States v. Magana, 512 F.2d 1169, 1171 (9th Cir. 1975)). "'In order to establish a reasonable expectation of privacy in [his] driveway, [defendant]

must support that expectation by detailing the special features of the driveway itself (i.e. enclosures, barriers, lack of visibility from the street) or the nature of activities performed upon it.'" Id. (quoting Maisano v. Welcher, 940 F.2d 499, 503 (9th Cir. 1991)). Here, the driveway was visible from Old Highway 78, and the officers were able to observe the defendants' actions from the highway. The tractor trailer was parked only two car-lengths away from the highway, and the driveway was easily accessible from the highway. Although a gate stood at the front of the property with a "Beware of Dog" sign, the gate was a stand-alone fixture without any fencing to the immediate right or left sides of the gate, the gate did not obstruct visibility or access to the driveway, the defendants were able to park the tractor trailer in the driveway without opening the gate, and there were no guard dogs on the property. Thus, Morales-Loya had no reasonable expectation of privacy in the driveway area. See id. at 1215 (holding that defendant could not claim a reasonable expectation of privacy in driveway of house where officers walked up to his driveway and attached a tracking device to his vehicle); United States v. Bucci, 582 F.3d 108, 116-17 (1st Cir. 2009) (holding that defendant did not have a reasonable expectation of privacy in the driveway of his home because "[a]n individual does not have an expectation of privacy in items or

places he exposes to the public"); United States v. Moffitt, 233 F. App'x 409, 412 (5th Cir. 2007) ("Moffit might have subjectively manifested his expectation of privacy by posting 'no trespassing' signs, but with a driveway open to neighbors and solicitors, it is not an expectation that society is prepared to accept as legitimate."); United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006) (holding that officers were lawfully allowed to approach defendant's front door because defendant did not have a reasonable expectation of privacy in his walkway and front door area); Knott v. Sullivan, 418 F.3d 561, 573-74 (6th Cir. 2005) (finding that private property owner had no reasonable expectation of privacy in driveway that was neither restricted from access nor hidden from public view); United States v. French, 291 F.3d 945, 953 (7th Cir. 2002) (driveway in public view not part of curtilage); United States v. Smith, 783 F.2d 648, 651 (6th Cir. 1986) ("The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy."); United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1984) (determining that "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors, such as driveways, walkways, or similar passageways");

United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (open
driveway in public view not curtilage despite "no trespassing"
signs).  And given the fact that the Old Highway 78 property was
not even used by Morales-Loya as his home, he had even a lesser
expectation of privacy.

For these reasons, the officers' initial approach onto the
property was lawful and did not violate the defendants' Fourth
Amendment rights.

**B.   Terry Stop and Detention**

Next, the defendants allege that the officers lacked
reasonable suspicion to detain them.  Figueredo-Diaz and Morales-
Loya were detained immediately after the initial approach of the
officers onto the property.  The seizure of Rivas, on the other
hand, was not effectuated until he was apprehended during the
search subsequent to his flight from the scene.  See California
v. Hodari D., 499 U.S. 621, 625-26 (1991) (holding that a Fourth
Amendment seizure of a fleeing individual did not occur until the
defendant was apprehended); United States v. Bobo, 2 F. App'x
401, 405 (6th Cir. 2001) (noting that defendants who fled while
throwing drugs from their person were not seized until officers
apprehended them after the chase).

As the court has concluded that the initial entry onto the
property was lawful, the subsequent detention of the defendants

-14-

by law enforcement officers cannot be deemed invalid as "fruit of the prior unlawful entry."  A detention will, however, be deemed unlawful if reasonable suspicion was lacking to justify the detention.  It is well established that the level of suspicion required to justify an investigatory stop or detention is reasonable suspicion.  <u>Terry v. Ohio</u>, 392 U.S. 1, 20-21 (1968); <u>United States v. Heath</u>, 259 F.3d 522, 528 (6th Cir. 2001).  "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity . . . .  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981).

In determining whether reasonable suspicion exists, the Supreme Court has instructed that a reviewing court must consider the "totality of circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002) (quotation marks omitted).  "While reasonable suspicion must be based on more than 'ill-defined hunches,' officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information

available to them that might well elude an untrained person.'"
United States v. Perez, 440 F.3d 363, 371 (6th Cir. 2006)
(quoting Arvizu, 534 U.S. at 273).  In considering all the
circumstances, the question is not whether there is a possible
innocent explanation for each of the factors, but whether all of
them taken together give rise to reasonable suspicion that
criminal activity may be afoot.  Arvizu, 534 U.S. at 274-75.

The court concludes that, considering the totality of the
circumstances, the officers had reasonable suspicion to conduct a
Terry stop of the defendants.  Officer Hoing received information
from a reliable informant that Rivas had purchased a one-way
plane ticket in cash, that he was flying from a source city, and
that he had purchased the ticket on the same day as the flight.
See United States v. Martin, 95 F. A'ppx. 169, 176 (6th Cir.
2004); United States v. Knox, 839 F.2d 285, 289-90 (6th Cir.
1988).  Rivas did not travel with any luggage, and only had a
backpack and two cell phones.  At the Kettle restaurant, Rivas
was seen meeting with two other men and inspecting the
undercarriage of the tractor trailer.  When the unidentified man
arrived in the Buick, the officers learned that the Buick was
registered to someone with the last name of Loya.  Officer Hoing
immediately recognized that name as being the same last name of
other individuals who he had investigated and arrested in

-16-

connection with large shipments of marijuana in the Memphis and northern Mississippi area. One of these investigations included the use of a warehouse during the drug transaction. Finally, the abrupt and prolonged flight of Rivas and the unidentified man in response to the officers' approach further supported the officers' reasonable suspicion. See United States v. Caruthers, 458 F.3d 459, 466 (6th Cir. 2006); see also Illinois v. Warlow, 528 U.S. 119, 124 (2000).

Once an officer has reasonable suspicion to detain a person, the detention must "last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). The investigative detention may become an arrest if it spans an unreasonable amount of time. United States v. Avery, 137 F.3d 343, 349 (6th Cir. 1997). The proper determination of a reasonable amount of time for an individual to be lawfully detained involves examining "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985). Here, it was necessary to detain the defendants while the officers looked for Rivas and the unidentified man and while the police canines were used to locate drugs on the property. The canine inspections were reasonable

under the circumstances in order for the officers to confirm or dispel their suspicions of drug trafficking. Each vehicle was subsequently searched by the officers, which again was necessary to confirm or dispel suspicions. By the time Officer Hoing returned to the scene and ran Tex inside the trailer, an hour had passed since the initial approach. However, this additional canine inspection was reasonable, especially given the fact that Officer Hoing was away from the scene looking for the fleeing suspects and Marco had previously alerted to the trailer. See United States v. Orsolini, 300 F.3d 724, 730 (6th Cir. 2002).

C.   **Search of the Tractor Trailer**

In terms of the search of the tractor trailer, the court finds that Morales-Loya lacked a reasonable expectation of privacy in the search of the tractor trailer, and therefore his challenge of the search must fail. Morales-Loya has presented no evidence of any expectation of privacy with respect to the tractor trailer, and therefore lacks "standing" to challenge the search. United States v. Patton, 292 F. App'x 159, 163-64 (3d Cir. 2008) (holding that district court did not err in concluding that defendant lacked standing to challenge search of Ford Explorer because defendant disavowed any ownership right in the vehicle). As for Rivas, who owned the tractor, and Figueredo-Diaz, who drove the tractor trailer and had personal items in the

tractor, the court need not decide whether they have standing to challenge the search, because as discussed below, the search was lawful.

In general, the Fourth Amendment requires either a warrant or exigent circumstances in order for officers to lawfully conduct a search without consent of the individual who possesses a reasonable expectation of privacy in the thing being searched. However, an exception to the warrant requirement exists through which police may search readily mobile automobiles if the police have probable cause to be believe that the vehicle contains evidence of some crime. United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (citations omitted); see also Carroll v. United States, 267 U.S. 132, 146-154 (1925) (introducing automobile exception to warrant requirement). The automobile exception is justified not only because the automobile may be easily moved out of the jurisdiction before a warrant can be procured, but also because "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." South Dakota v. Opperman, 428 U.S. 364, 367 (1976).

In this case, the officers had sufficient probable cause to search the tractor trailer for drugs, based on the officers' observations leading up to the detention and Marco's and Tex's

positive alerts for the scent of narcotics in the trailer.   An alert by a trained drug detecting canine alone would be sufficient to support a determination of probable cause for the presence of illegal contraband.   See United States v. Ohoro, No. 2:09cr183-MHT, 2010 WL 2803043, at *9 (M.D. Ala. July 16, 2010) (citing cases); United States v. Salas, No. 109-CR-28, 2010 WL 746763, at *6 (N.D. Ind. Mar. 2, 2010); United States v. Sharp, No. 3:09-CR-72, 2009 WL 4348473, at *10 (E.D. Tenn. Oct 21, 2009) (citing cases).

In order for a canine sniff to provide support for probable cause to search a vehicle, the government bears the burden of proving the training and reliability of the dog.   Sharp, 2009 WL 4348473, at *10.   While the defendants challenge the reliability of Marco based on his three "false positive" alerts that day, "the fundamental determination in evaluating the training and reliability of a drug-detection dog is the credibility of the handler's testimony," not the amount of false positives.   United States v. Howard, 448 F. Supp. 2d 889, 889-900 (E.D. Tenn 2006). Because apparent "false positives" can be explained by the possible existence of lingering odors from previous use of narcotics in the area, the measure of a dog's reliability is whether it is properly trained, as testified to by its handler. Id.   Here, Office Gibbs testified that Marco was a properly

trained and certified narcotics detection canine, and the court credits his testimony.  The positive alert from Marco on the presence of narcotics inside the tractor trailer was therefore sufficient, by itself, to support probable cause.  Moreover, the officers had probable cause to search the tractor trailer based solely on the second, independent positive alert from Tex.  The defendants do not allege that the officers lacked probable cause to search the tractor trailer based on Tex's positive alert, nor do they challenge Tex's reliability.

The tractor trailer had been extensively driven on highways and public roads, and at the time of the search, it had just been parked in an area easily accessible to the public.  The tractor trailer was therefore a readily mobile vehicle and subject to the automobile exception to the warrant requirement.  See United States v. Navas, 597 F.3d 492, 497 (2d Cir. 2010) (applying automobile exception to trailer detached from tractor); United States v. Flores, 368 F. App'x 424, 435 (4th Cir. 2010) (applying automobile exception to tractor trailer); United States v. Castelo, 415 F.3d 407, 412 (5th Cir. 2005) (applying automobile exception to tractor trailer); United States v. Smith, 623 F. Supp. 2d 693, 708 (W.D. Va. 2009) (applying automobile exception to locked trailer on defendant's property, even though a tractor was not located nearby).

**D.** __Statements Made by Rivas__

Rivas alleges that his statements made after receiving his __Miranda__ warnings should be suppressed because the statements were the fruits of the illegal detention and search. As the court has found the detention and search to be lawful, the motion to suppress his statement is without merit. __See__ __Wong Sun v. United States__, 371 U.S. 471, 485 (1963).

**E.** __Search of 2006 Nissan in McAllen__

Officer Hoing testified that law enforcement officers in McAllen, Texas, searched a 2006 Nissan belonging to Figueredo-Diaz, which was parked at the McAllen airport. The car was searched without Figueredo-Diaz's consent or a warrant. At the suppression hearing, the government stated that it would not use the items seized from the 2006 Nissan at trial. Thus, to the extent Figueredo-Diaz's motion seeks exclusion of that evidence, the court recommends that the motion be denied as moot.

**III.   CONCLUSION**

For the reasons above, the court recommends that the Motions to Suppress be denied for all defendants.

Respectfully submitted,

<div style="margin-left:40%">

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

November 15, 2010

</div>

Date

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).   FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**