# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 09-20468-STA-tmp** |
| | ) | |
| **EMILIO RIVAS,** | ) | |
| **ANIBAL FIGUEREDO-DIAZ, and** | ) | |
| **DARIO MORALES-LOYA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ADOPTING IN PART, REJECTING IN PART THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court are the Defendants' separate Objections (D.E.# 167, 168, 169) to the Magistrate Judge's Report and Recommendation (D.E. # 156).  On July 16, 2010, the United States Magistrate Judge conducted a hearing on Defendants' Motions to Suppress (D.E. # 76, 95, 98, 107, 135).  On November 15, 2010, the Magistrate Judge issued his Report and recommended that the Court deny the Defendants' Motions.  The Defendants' timely Objections followed.  For the reasons set forth below, the Magistrate Judge's Report and Recommendation is **ADOPTED IN PART, REJECTED IN PART**.  Defendant Dario Morales-Loya's Motion to Suppress (D.E. # 76, 95) and Defendant Anibal Figueredo-Diaz's Motion to Suppress (D.E. # 98) are **GRANTED**.  Defendant Emilio Rivas' Motions to Suppress (D.E. # 107, 135) are **DENIED**.

1

## BACKGROUND

The parties have not objected to the Magistrate Judge's proposed findings of facts in this matter.  Therefore, the Court adopts the Magistrate Judge's proposed findings of fact as follows: on November 5, 2009, DEA Task Force Officer Joe Hoing ("Officer Hoing") received information from a confidential informant that Emilio Rivas ("Rivas") had purchased a one-way plane ticket from McAllen, Texas to Memphis, Tennessee.  The informant – who in the past had provided Officer Hoing with reliable information about criminal activities on "many, many" occasions – stated that Rivas had booked the ticket the day before, that he would be arriving in Memphis at around 9:00 A.M on November 5, and that he paid for the ticket in cash on the same day as the flight.  At around 8:30 A.M. on November 5, Officer Hoing arrived at the Memphis International Airport.  At approximately 9:00 A.M., he observed Rivas deplane a Continental Airlines flight arriving from McAllen (via a connection flight in Houston).  Rivas was carrying a backpack and two cell phones but no luggage.  While maintaining surveillance on Rivas, Officer Hoing used his cell phone to dial the phone number Rivas had given the airline and observed Rivas answer one of his phones in response to the call.  Officer Hoing testified that, based on his many years of experience and training in narcotics investigations, the purchase of a one-way ticket from a source city, the making of reservations shortly before a flight, the payment for the plane ticket in cash on the same day as the flight, and the use of multiple cell phones were facts consistent with someone engaging in drug trafficking.[1]

---

[1] Prior to becoming a DEA Task Force Officer, Officer Hoing was employed by the Memphis Police Department for thirty-three years.  He has conducted numerous investigations into violations of the narcotics laws, ranging from simple possession of narcotics to complex international conspiracies.  He is familiar with the operation of illegal drug trafficking organizations and the methods used to import and distribute narcotics.  He also has expertise in

2

Officer Hoing then observed Rivas proceed to a ticket counter to speak to an airline employee.  Officer Hoing stood close to Rivas and could hear that Rivas was fluent in English.  Officer Hoing, as well as other DEA Task Force Officers who were assisting in the surveillance, closely followed Rivas as he walked out of the airport, entered a taxi, and traveled to the Kettle Restaurant on Brooks Road in Memphis.  At the restaurant, the officers observed Rivas exit the taxi and walk over to a tractor trailer which was parked in the restaurant's parking lot.  The tractor trailer was occupied by an individual later identified as Anibal Figueredo-Diaz ("Figueredo-Diaz"), who was sitting in the front passenger's seat.  Rivas climbed into the driver's seat of the tractor trailer, which had a Texas license plate.  The officers checked the plate and determined that the tractor was registered to Rivas, while the trailer was registered in someone else's name.  Figueredo-Diaz then exited the tractor trailer and, while talking on his cell phone, walked to a nearby gas station.  At that time, Rivas also exited the tractor, walked to the back of the trailer, and conducted a visual inspection of the undercarriage of the trailer.  Rivas then walked to the edge of the parking lot and began talking on his cell phone.  A short time later, a black Chevrolet Blazer with a Mississippi license plate driven by a man later identified as Dario Morales-Loya ("Morales-Loya") pulled into the parking lot.  Rivas got into the Blazer and exited the parking lot with the tractor trailer driven by Figueredo-Diaz following closely behind.

The officers followed the vehicles as they traveled to a Pilot truck stop on Highway 78 in Memphis.  Morales-Loya drove the Blazer across the front of the parking lot of the truck stop

monitoring drug trafficking through air travel and has conducted "hundreds" of investigations into drug trafficking at Memphis International Airport.

and then headed southbound towards the Mississippi state line, while Figueredo-Diaz drove to the back of the truck stop and parked the tractor trailer.  DEA Task Force Officer Dan Jones remained at the truck stop to maintain surveillance on Figueredo-Diaz and the tractor trailer, while Officer Hoing and others followed the Blazer into Mississippi.[2]

The Blazer eventually arrived at a property located at 7116 Old Highway 78 in Olive Branch, Mississippi ("Old Highway 78 property").[3]  Officers Hoing and Eric Hill conducted surveillance from across the street.  The officers could see at the front entrance of the property a metal chain-link gate supported by two metal polls.  A "Beware of Dog" sign was affixed to the front of the gate, although there were no guard dogs on site.  The chain-link gate stood by itself without any fencing to the left or right of the gate.  Other than this stand-alone gate, there were no other barriers across the front of the property.  The gate did not obstruct access to the driveway or other structures on the property.  Although there was some metal fencing on the sides of the property, Officer Hoing testified that the lot was "not completely fenced in."  The driveway and structures on the property were clearly visible to the officers and anyone on the road.

Morales-Loya pulled into the driveway on the property and up to the front of a warehouse.  Morales-Loya and Rivas exited the Blazer, opened the doors to the warehouse, and went inside.  Shortly thereafter, they walked out of the warehouse and walked through the side

---

[2] Upon leaving the truck stop, Officer Hoing contacted the Olive Branch Police Department to notify them that the suspects were entering Olive Branch's jurisdiction.  Officer Hoing also advised the Oliver Branch police that he would need uniformed support.

[3] Officer Hoing later obtained a copy of the lease to this property.  The lease indicated that the property was being rented to Morales-Loya from the property owner, Brown Land Investment.  The lease described the premises as a "Shop and Office."

door of a small house located directly adjacent to the warehouse.[4]  A few minutes later, an

unidentified man arrived on the property in a white Buick with a Mississippi license plate.  The

officers checked the Buick's registration and discovered that the vehicle was registered to

someone named "Simon Loya" of Horn Lake, Mississippi.  Officer Hoing immediately

recognized the name Loya, as he had been involved in a long-term narcotics investigation of

several individuals with the last name of Loya in the Memphis and North Mississippi area.

Specifically, in August of 2004, Officer Hoing participated in a DEA controlled delivery of over

1,000 pounds of marijuana to a business associated with the Loyas in Southaven, Mississippi.

That transaction involved a tractor trailer delivering marijuana to a warehouse.  Also, in June of

2007, Officer Hoing participated in a DEA investigation and seizure of over 1,500 pounds of

marijuana from a person named Guadalupe Loya.

      The unidentified driver of the Buick entered the house, and then all three men walked out

of the house.  Rivas and the unidentified man entered the Buick and drove back to the Pilot truck

stop.  The Buick pulled up next to the tractor trailer occupied by Figueredo-Diaz.  The Buick,

followed by the tractor trailer driven by Figueredo-Diaz, left the Pilot truck stop and traveled

back to the Old Highway 78 property.  Figueredo-Diaz pulled up to the driveway in front of the

warehouse and attempted to back up the tractor trailer to the warehouse.  Rivas was apparently

not satisfied with Figueredo-Diaz's attempts to back up the tractor trailer, so he proceeded to

take over as the driver.  Rivas managed to park the tractor trailer in the driveway, in close

proximity to the warehouse.  Officer Hoing could see that the front of the tractor trailer was only

_____

[4] Although Officer Hoing referred to the small structure as a "house" in his report, he
testified at the hearing that the structure could have been either a house or an office, but that it
was, in fact, uninhabited and vacant.

"two car-lengths" from the highway.  Rivas exited the tractor trailer and joined Morales-Loya, Figueredo-Diaz, and the unidentified man at the rear of the trailer.  Both rear doors of the trailer were open.

By that time, six to eight armed officers had arrived on the scene, all dressed in police gear and bullet-proof jackets.  On Officer Hoing's signal, the officers approached the four men with guns drawn and verbally announced their presence as "police."  Morales-Loya complied and was ordered to the ground, and Figueredo-Diaz, who apparently did not immediately comply, was pushed to the ground.  Both were immediately handcuffed by the officers.  Rivas and the unidentified man, however, fled the scene and headed towards the wooded area at the rear of the property.  Officer Hoing and other officers searched for the two fleeing suspects, and with the assistance of two helicopters, the officers were able to apprehend Rivas more than an hour later.  The unidentified man who had fled with Rivas was never found.

While Officer Hoing was away from the scene in pursuit of Rivas, other officers remained on the property holding Figueredo-Diaz and Morales-Loya in custody.  Officer Mike Gibbs of the Olive Branch Police Department arrived on the scene and, with his narcotics-detection canine "Marco," walked around the vehicles on the property, which included the tractor trailer, the Blazer, the Buick, and a van parked inside the warehouse.  Although Marco alerted to the scent of narcotics in the Blazer, Buick, and van, a search of those vehicles did not uncover any physical evidence of narcotics.

While walking around the tractor trailer, Marco alerted to the scent of narcotics underneath the front of the trailer, near the section where the trailer connected to the tractor.  The officers cut the lock on the back of the trailer, but their search of the inside of the trailer did not

uncover any narcotics.  Officer Hoing, who by this time had returned to the property, walked his own narcotics-detection canine "Tex" around the tractor trailer.  Tex stopped near the front of the trailer and alerted at the trailer's steel floor.  Officers then drilled the trailer floor and discovered a large quantity of marijuana hidden in the insulation space inside the trailer's undercarriage.  The officers recovered over 2,000 pounds of marijuana from the trailer's hidden compartment and seized $12,000 in cash from the sleeper compartment of the tractor.  Several items, including receipts, statements, cards, a medical examiner certificate, and a passport, all belonging to Figueredo-Diaz, were found in the tractor portion of the vehicle.

Rivas, Morales-Loya, and Figueredo-Diaz were arrested and transported to the Memphis DEA office.  The defendants were orally advised of their Miranda rights.  Officer Hoing testified that "Spanish-speaking persons" were present to advise the defendants of their Miranda rights in Spanish.  Each of the defendants indicated they understood their rights.  Rivas gave a statement to the officers and explained that the truck belonged to him but that the tractor belonged to individuals who had hired him for a fee of $15,000 to transport 1,000 pounds of marijuana to Memphis.  When the officers told Rivas that the actual amount of marijuana recovered was well over 2,000 pounds, Rivas became upset because he felt he had been cheated by the persons who had hired him.

Each defendants was later indicted on one count of conspiring to possess with the intent to distribute and to distribute at least 100 kilograms of marijuana, in violation of 21 U.S.C. § 846, and one count of possessing with the intent to distribute at least 100 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1).

In his Objections to the Magistrate Judge's Report and Recommendation, Defendant

Rivas has asked the Court to consider the following additional facts[5]: during his surveillance, Officer Hoing contacted his superior about sending more agents and contacted the Olive Branch Police Department as a courtesy when the DEA entered Mississippi.  (Suppression Hr'g Tr. 72:13-19, July 16, 2010.)  When Officer Hoing observed all four men at the rear of the trailer with the trailer doors open, officers approached.  (41:24-42:4.)  Six to eight DEA Task Force officers were on the scene, and Officer Hoing had called in additional support from the Olive Branch Police Department's narcotics unit. (42:7-11.)  The officers were wearing clothing and bullet-proof jackets that identified themselves as officers, and they verbally identified themselves as police. (42:14-18.)  Officer Hoing testified that he had only shouted the word "police" and that he could not articulate what compliance with his command would have been. (128:11-13.) He also testified that Figueredo-Diaz was not "complying" with the command "police," and so he was pushed down. (128:1-10.)  Hoing acknowledged that approaching with guns drawn and placing suspects in handcuffs is consistent with detention and arrest. (94:9-12.)

When the DEA and other law enforcement agents approached, Officer Hoing had seen no illegal activity. (93:11-13.)  Officer Hoing could not explain why a warrant was never obtained, other than to say that "we were moving along at a pretty fast pace at that point." (146:10-21.) When asked if he had probable cause to enter the property, Officer Hoing responded, "I believe at that time, yes, sir, I did. *I do not believe I probably had enough to get a warrant at that particular moment*, but, yes, sir, I do believe that I had probable cause." (148:14-19) (emphasis added). Officer Hoing admitted that there were no exigent circumstances that prevented him

---

[5] Defendants Figueredo-Diaz and Morales-Loya have joined in Defendant Rivas' statement of additional facts.  To the extent that the statements repeat facts already included in the Magistrate Judge's Report, the Court will not repeat those facts here.

from obtaining a warrant. (150:19-25.)  He did not see an exchange of money or drugs. (185:12-17.)  He did not even have information from his source that drugs were involved. (185:18-20.)  There was no drug transaction at the restaurant or at the Pilot gas station. (186:1-7.)  At the time of their approach on the Old Highway 78 property, all law enforcement had at that point was a hunch despite the fact that "it turned out to be a good hunch, yes, sir." (186:11-13.)

In his Report and Recommendation, the Magistrate Judge concluded that Defendants' separate Motions to Suppress should be denied.  First, the Magistrate Judge reasoned that the officers did not violate the Defendants' Fourth Amendment rights by coming onto the Old Highway 78 property.  Second, the Magistrate Judge held that the officers had reasonable suspicion to conduct their investigative detention of the Defendants and that the detention lasted only long enough to bring the drug canines to the scene and to seize Rivas after his flight.  Third, the search of the tractor trailer was lawful because the officers had probable cause to conduct the search after two drug dogs alerted to the presence of narcotics.[6]  The Magistrate Judge credited the testimony of the dogs' handlers that each dog was properly trained and reliable.  Additionally, the Magistrate Judge stated that the automobile exception to the warrant requirement would apply in this instance.  Based on the Court's recommended holding that the search was lawful, the Magistrate Judge concluded that there was no basis to suppress Rivas' statements to police made after his arrest.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636, the Court may refer a motion to suppress in a criminal

---

[6] With respect to the search of the tractor trailer, the Magistrate Judge determined that Defendant Morales-Loya lacked standing to challenge the search.

matter to a magistrate judge for the purpose of conducting an evidentiary hearing and to submit proposed findings of fact and recommendations for the disposition of the motion.[7]  The Court must "make a de novo determination of those portions of the report or specific proposed findings or recommendations to which objection is made."[8]  After reviewing the evidence, the Court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.[9]  The Court need not review, under a de novo or any other standard, those aspects of the report and recommendation to which no specific objection is made.[10]  Rather the Court may adopt the findings and rulings of the magistrate judge to which no specific objection is filed.[11]

Defendants have raised a number of objections to the Magistrate Judge's Report and Recommendation.  In his separate Objections (D.E. # 167), Defendant Rivas argues, and his co-Defendants join in his Objections, that the officers did not have reasonable suspicion to detain any of the Defendants.  Even if the agents had reasonable suspicion, Defendants argue that in view of the circumstances the seizure was an arrest requiring probable cause, and not a *Terry* stop.  The six to eight DEA agents came on to the property with guns drawn and wearing bulletproof vests.  The agents had the additional support of two helicopters and the Olive Branch Police Department.  Because the detention and/or arrest was improper, the agents' warrantless search of the tractor trailer was also improper.  The agents did not have probable cause or

---

[7] 28 U.S.C. § 636(b)(1)(B).

[8] § 636(b)(1)(C).

[9] *Id.*

[10] *Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

[11] *Id.* at 151.

exigent circumstances to justify the search of the vehicles.  The drug canines came on to the scene as part of the unreasonable detention.  Defendant Rivas contends that because Officer Hoing had time to line-up several agents for the raid, he also had time to procure a warrant.

In his own separate Objections (D.E. # 168), Defendant Figueredo-Diaz attacks the reliability of the drug canines used in the investigatory detention.  With respect to Marco, Defendant argues that the dog had just given three false positives during the officers' search of the vehicles at the scene.  The independent alert from Tex was only made possible after the officers cut the lock on the trailer and put Tex in the hold.  But for Marco's unreliable alert, the officers would not have had probable cause to enter the trailer with Tex.  Even if Marco was reliable, the fact that officers did not recover any illegal narcotics as a result of Marco's alerts dispelled their suspicions.  At that point it was unreasonable to extend the detention while Officer Hoing ran Tex over the trailer.  Therefore, in addition to the errors raised in Defendant Rivas' Objections, Defendant Figueredo-Diaz argues that the Court should deny his Motion to Suppress.

Finally, in his separate Objections (D.E. # 169), Defendant Morales-Loya argues that the police had no justification for entering the property.  As the lessee of the property, Defendant maintains that he had an expectation of privacy in the premises.  According to Defendant, the building described variously as an "office" or "house" was actually his residence.  Defendant further contends that the agents did not have reasonable suspicion, much less probable cause, to conduct the search.  Finally, Defendant makes arguments similar to those advanced by his co-Defendants about the propriety of the search of the tractor trailer.

The United States has indicated that it has no objection to the Magistrate Judge's Report

and Recommendation.

## ANALYSIS

**I.      Reasonableness of the Coming Onto the Old Highway 78 Property**

The Magistrate Judge made the initial determination that none of the Defendants had a privacy interest in the premises.  As a result, the DEA did not violate Defendants' Fourth Amendment rights by coming onto the property.  The Magistrate Judge concluded that Defendants Rivas and Figueredo-Diaz lacked any expectation of privacy in the Old Highway 78 property.  Those Defendant have not challenged this proposed holding.  As for Defendant Morales-Loya, the Magistrate Judge held that he had little or no privacy interest in the premises, including the warehouse and the driveway.  Although Defendant Morales-Loya has objected to this proposed holding, the Court agrees with the Magistrate Judge's analysis.  Therefore, Defendant Morales-Loya's Objection is overruled, and the Court hereby **ADOPTS** the relevant portion of the Magistrate Judge's Report and Recommendation.

**II.      Seizure of the Defendants**

The primary issue for the Court is whether the agents were justified in seizing any of the Defendants.  The Magistrate Judge reasoned that under the totality of the circumstances, the agents had reasonable suspicion to detain all three Defendants.  The Magistrate Judge based his conclusion on the information Officer Hoing received from a reliable informant: that Rivas had purchased a one-way plane ticket in cash, that he was flying from a source city, and that he had purchased the ticket on the same day as the flight.  Rivas had no luggage, only a backpack and two cell phones.  Rivas then met with two other men and inspected the undercarriage of the tractor trailer.  In the course of their surveillance, agents determined that one of the vehicles

12

involved was registered to someone with the last name Loya.  Officer Hoing recognized the name because he had conducted other investigations of drug trafficking in Memphis and North Mississippi involving suspects named Loya.  One of those other cases had also involved the use of a warehouse in a drug transaction.  The Magistrate Judge held that these facts taken together with the flight of Rivas at the officers' approach supported a reasonable suspicion of illegal activity.

The Sixth Circuit has recognized three distinct categories of police-citizen encounters: (1) an arrest supported by probable cause; (2) an investigatory stop (also known as a *Terry* stop) which is a limited, non-intrusive detention supported by reasonable suspicion based on articulable facts; and (3) consensual encounters where an officer seeks the voluntary cooperation of a citizen and requires no suspicion at all.[12]  It is undisputed in this case that a seizure of some kind, and not a consensual encounter, ensued when the agents approached the four men on the Old Highway 78 property.[13]  Where a seizure occurs, "the Fourth Amendment's protections apply."[14]  Defendants argue that based on the show of force, the seizure here was an arrest, not an investigative detention.  The Court finds that the DEA agents' show of force and authority was consistent with an investigative detention and did not transform the seizure into an arrest.  Under the circumstances, "the degree of force utilized by officers during [the] detention [was]

---

[12] *United States v. Dotson*, 49 F.3d 227, 230 (6th Cir. 1995).

[13] Among the factors that might indicate a seizure, and not a consensual encounter, are the following: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Gross*, 624 F.3d 309, 315 (6th Cir. 2010) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

[14] *United States v. Williams*, 615 F.3d 657, 666 (6th Cir. 2010).

reasonably related in scope to the situation at hand."[15]  The Supreme Court has held that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[16]  Furthermore, when police have a reasonable fear that suspects are armed and dangerous, they may draw weapons, use handcuffs, and take other steps to ensure their own safety "so long as circumstances warrant that precaution."[17]  This rule is consistent with *Terry* where the Supreme Court remarked that police officers should not be "required to take unnecessary risks in the performance of their duties."[18]  The Sixth Circuit has repeatedly approved the display of weapons, the use of handcuffs, and the application of force to get detainees on the ground during investigations of drug trafficking, reasoning that "weapons are frequently used in drug transactions" and finding these measures necessary for officer safety.[19]  Applying these principles to the facts of this case, the Court holds that the DEA agents' approach on the Old Highway 78 property was consistent with an

---

[15] *United States v. Heath,* 259 F.3d 522, 530 (6th Cir. 2001) (citations and quotations omitted).  *See also United States v. Norfleet*, No. 04-5764, 143 F. App'x 645, 650-51, 2005 WL 1916505, at *4 (6th Cir. Aug. 10, 2005).

[16] *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  *See also Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008).

[17]  *Radvansky v. City of Olmsted Falls,* 395 F.3d 291, 309 (6th Cir. 2005) (quoting *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814-15 (6th Cir. 1999)).

[18] *Terry v. Ohio,* 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

[19] *Heath*, 259 F.3d at 530.  *See also United States v. Jackson*, No. 05-3239, 179 F. App'x. 921, 930, 2006 WL 1208077, at *8 (6th Cir. May 4, 2006) (finding that officer was "entitled to take measures to protect himself, including drawing his firearm, and ordering and holding [suspect] to the ground"); *Norfleet*, 143 F. App'x at 651; *United States v. Lindsey*, No. 03-4029, 114 F. App'x 718, 721-22, 2004 WL 2625066, at *2 (6th Cir. Nov. 17, 2004) ("The actions of the officers in approaching Lindsey with guns drawn, ordering him to the ground, and frisking him did not transform the *Terry* stop into an arrest."); *United States v. Richardson*, No. 00-6168, 40 F. App'x 7, 13, 2002 WL 261824, at *4 (6th Cir. Feb. 21, 2002).

investigative stop on suspicion of drug trafficking.

Having concluded that the seizure of Defendants was an investigative detention, the Court must now consider whether the officers had reasonable suspicion to detain Defendants. Searches based on less than probable cause are permissible when the purpose of the detention is investigative, the length of time is reasonable, and the scope is limited to alleviating suspicion.[20] Pursuant to *Terry*, police can stop and briefly detain a person when the police have "reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity."[21] "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape."[22] A reasonable suspicion is one "based on specific, objective facts."[23] An "inchoate and unparticularized suspicion or hunch" will not give rise to reasonable suspicion.[24] In evaluating whether police had reasonable suspicion, the Court must consider the totality of the circumstances rather than analyze each fact in isolation.[25] Because an investigative stop requires a "particularized and objective basis for suspecting the particular

---

[20] *Hiibel v. Sixth Judicial Dist. Court of Nevada,* 542 U.S. 177, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292 (2004).

[21] *United States v. Smith,* 594 F.3d 530, 536 (6th Cir. 2010).

[22] *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

[23] *United State v. Williams*, 615 F.3d at 666 (quoting *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)).

[24] *Id*. (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868) (other quotation omitted).

[25] *United States v. Arvizu,* 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *United States v. Williams*, 615 F.3d at 666.

person of criminal activity,"[26] the Court must determine whether the agents had reasonable suspicion as to each Defendant.  Therefore, the Court will analyze the agents' level of suspicion as to each Defendant in turn.

A.      **Defendant Rivas**

In light of the uncontested findings of fact in this case, the Court holds that the agents had reasonable suspicion to detain Defendant Rivas.  The evidence shows that Officer Hoing had received a tip from a known informant about Defendant Rivas' travel arrangements.  The Court notes that the actual content of Hoing's tip did not include any information that Rivas was engaged in a drug trafficking crime.[27]  Rather the informant indicated that Rivas had paid cash for a one-way plane ticket from McAllen, Texas on the same day of his flight.  Upon Rivas' arrival in Memphis, Officer Hoing observed Rivas use a second cell phone.[28]  Based on his experience in narcotics interdiction, Hoing testified that these activities were consistent with drug trafficking.  The Sixth Circuit has previously held in drug trafficking cases that a defendant's travel from a "source city" on a one-way ticket purchased in cash on the same day as

---

[26] *United States v. Campbell,* 549 F.3d 364, 371 (6th Cir. 2008).

[27] *See United States v. Hudson*, 405 F.3d 425, 434 (6th Cir. 2005) ("[w]hether there was reasonable suspicion depends on the actual content of the tip [the police] received, not what [the police] subjectively believed the information to be.") (quoting *United States v. Payne,* 181 F.3d 781, 789 (6th Cir. 1999)).

[28] After establishing visual contact with Rivas, Officer Hoing observed Rivas talking on a cell phone.  Hoing then called the phone number Rivas had provided the airline when he purchased his plane ticket.  Hoing testified that Rivas pulled out a second phone to answer Hoing's call, thus establishing that Rivas had two cell phones.  Suppression H'ring Tr. 31:3-10, July 16, 2010.

the flight are among the factors that might support a reasonable suspicion of drug trafficking.[29]

In the case at bar, the Court finds that Rivas' travel is significant to the DEA's reasonable suspicion.  However, the Court would note that in *Knox* and *Martin*, the Sixth Circuit found that police had many other articulable facts to support their reasonable suspicion.[30]  For example, the three *Knox* defendants did not just pay cash for one-way tickets for same-day travel through a source city but had purchased their three tickets at the same time.[31]  And yet during their travel the suspects had at times acted to conceal the fact that they were traveling together and at other times talked openly to each other.[32]  One suspect was observed rushing to an airport restroom, holding her arms across her stomach after deplaning.[33]  Officers further determined that none of the suspects were known at the callback number given when their tickets were purchased.[34]  In short, the police's reasonable suspicion of the *Knox* suspects was supported by a series of acts and behaviors, not just the purchase of their tickets and the nature of their travel.

---

[29] *United States v. Martin*, No. 02-6009, 95 F. App'x 169, 176, 2004 WL 835559, at *5 (6th Cir. Apr. 16, 2004); *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988).  The Magistrate Judge cited both decisions in his Report and Recommendation.

[30] "The 'drug courier profile' is an abstract of characteristics found to be typical of persons transporting illegal drugs." *Knox*, 839 F.2d at 290 n.2 (citing *Florida v. Royer,* 460 U.S. 491, 493 n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983)).  The Sixth Circuit has added that "the variety of traits constituting these 'profiles,' which varies from airport to airport, defies any attempt at mechanical application and requires courts to assess 'whether in each particular case the combination of facts present and the manner in which they are exhibited justifies a stop.'" *Id*. (quoting *United States v. Saperstein*, 723 F.2d 1221, 1228 (6th Cir. 1983)).

[31] *Knox*, 839 F.2d at 288.

[32] *Id*. at 287-88.

[33] *Id*. at 287.

[34] *Id*. at 288.

The same is true in *Martin* where the police had several other articulable facts in addition to the cash purchase of the airline tickets for one-way travel on the same day of the purchase.  In that case, the agents observed a man and woman approach the airline ticket counter together.[35] Despite the fact that the couple made flight reservations separately, the male paid cash for both one-way tickets to Houston, Texas.[36]  The couple then left the airport.[37]  Shortly thereafter, what appeared to be a second couple returned and went to the boarding gate, identifying themselves with the names given by the first couple who had purchased the tickets.[38]  Agents observed the second couple check-in separately and wait for boarding as if they did not know each other.[39] The agents also noticed what they believed to be bulges in the woman's clothing.[40]  Just as in *Knox*, the investigators had much more than just the circumstances surrounding the purchase of the tickets to give rise to a reasonable suspicion of illegal activity.

Though not dispositive, the circumstances of Rivas' travel in this case are highly relevant to the Court's analysis.  Furthermore, the Magistrate Judge noted the fact that Rivas met Defendant Figueredo-Diaz at a restaurant where Rivas inspected the undercarriage of the tractor trailer Figueredo-Diaz was driving.  The unknown fourth suspect later appeared at the Old Highway 78 property driving a vehicle registered to an individual named Loya, a name Officer

---

[35] *Martin*, 95 F. App'x at 171.

[36] *Id*.

[37] *Id*. at 172.

[38] *Id*.

[39] *Id*.

[40] *Id*.

Hoing associated with other drug trafficking investigations in the metro area.  The Court agrees with the Magistrate Judge's conclusion that these additional, articulable facts are all relevant to the issue of whether Officer Hoing and the other agents had a reasonable suspicion of illegal activity as to Defendant Rivas.

The conclusive fact supporting the DEA's reasonable suspicion of Defendant Rivas was his headlong flight at the approach of the DEA agents.  The evidence shows that as soon as the DEA came on to the Old Highway 78 property, Defendant Rivas and another suspect immediately ran from the scene.  Defendant Rivas eluded capture for approximately one hour and was finally discovered some distance away, after traversing a creek, running through a wooded area, and losing his shirt and both shoes.[41]  Flight upon contact with law enforcement is a factor that will support reasonable suspicion of illegal activity.[42]  It is important to note that reasonable suspicion for an investigatory stop cannot be based on events that occur after the suspect is seized.[43]  In this case, however, by fleeing and not submitting to the officers' show of authority, Defendant Rivas was not seized at the agents' initial approach.  The Sixth Circuit has held that "there is no seizure without actual submission" and that without actual submission "there is at most an attempted seizure."[44]  As a result, Defendant Rivas was not seized for

---

[41] Suppression Hr'g Tr. 44:8-25.

[42] *E.g. Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *Smith,* 594 F.3d at 540-41; *United States v. Johnson,* 620 F.3d 685 (6th Cir. 2010); *United States v. Caruthers,* 458 F.3d 459 (6th Cir. 2006); *United States v. White,* No. 03-4488, 129 F. App'x 197, 203-204, 2005 WL 873372, at *6 (6th Cir. Apr. 18, 2005); *United States v. Matthews,* 278 F.3d 560 (6th Cir. 2002); *United States v. Pope,* 561 F.2d 663, 668 (6th Cir. 1977).

[43] *Johnson*, 620 F.3d at 696 (citations omitted).

[44] *United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009) (citing *Brendlin v. California,* 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) and *California v. Hodari D.*, 499 U.S.

purposes of the Fourth Amendment until his capture about one hour after Officer Hoing and his team entered the Old Highway 78 property.  It follows that Defendant Rivas' flight is an articulable fact that would go to support a finding of reasonable suspicion.

Based on the totality of these circumstances, the Court holds that the agents had reasonable suspicion of illegal activity to detain Defendant Rivas.  Therefore, the Court **ADOPTS** the relevant portion of the Magistrate Judge's Report and Recommendation.

**B.**     ***Defendants Figueredo-Diaz and Morales-Loya***

On the other hand, the Court holds that the agents did not have a reasonable suspicion to detain Defendants Figueredo-Diaz and Morales-Loya at the time of their seizure.  Here the Court departs from the Magistrate Judge's recommended conclusion that the flight of Defendant Rivas would support a reasonable suspicion as to Defendants Figueredo-Diaz and Morales-Loya. Unlike Rivas, Figueredo-Diaz and Morales-Loya actually submitted to the officers' show of authority when the agents first came onto the property.  For purposes of the Fourth Amendment then, these two Defendants were seized and their detention began at roughly the same time as Rivas' flight.  As previously noted, reasonable suspicion cannot be based on events that occur after a defendant is seized.[45]  Therefore, the Court holds that Rivas' flight is not a proper factor in determining whether the agents had reasonable suspicion as to Defendants Figueredo-Diaz and Morales-Loya.

In view of the articulable facts known to Officer Hoing prior to the seizure, the Court

---

621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).  *See also Smith*, 594 F.3d at 538-39.

[45] *Johnson*, 620 F.3d at 696.

concludes that agents lacked a reasonable suspicion of illegal activity on the part of Defendants Figueredo-Diaz and Morales-Loya. The facts available to the DEA included (1) Rivas' travel pattern consistent with a drug trafficking profile; (2) Rivas' inspection of the undercarriage of the tractor trailer driven by Figueredo-Diaz; and (3) the presence of an automobile registered to an individual named Loya. However, these acts largely did not involve or implicate Defendants Figueredo-Diaz or Morales-Loya. For instance, neither Defendant was present when Rivas inspected the undercarriage of the tractor trailer. Figueredo-Diaz had walked to a nearby gas station, and Morales-Loya had not even appeared on the scene. The fourth suspect drove the Buick registered to a person named Loya. The Court finds then that none of these factors provided the DEA with a "particularized and objective basis for suspecting [Defendants Figueredo-Diaz or Morales-Loya] of criminal activity."

It is clear that Defendants came under suspicion largely because of their association with Rivas. The record shows that Defendants Figueredo-Diaz and Morales-Loya met Rivas upon his arrival in Memphis. Figueredo-Diaz was driving the tractor-trailer containing the narcotics. After their rendezvous, the men traveled to a truck-stop, then drove to the Old Highway 78 property, then went back to the truck stop, and finally arrived back at the Old Highway 78 property. The Court finds that Defendants' "mere companionship" with Rivas in this case is not enough to establish reasonable suspicion.[46] Under the totality of the circumstances, the Court

---

[46] *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005); *United States v. Padro,* 52 F.3d 120, 123 (6th Cir. 1995) (all considering an individual's companionship or proximity to one suspected of illegal activity insufficient to establish probable cause). Although these cases concern probable cause, the Sixth Circuit has stated, "Courts analyzing searches under the reasonable suspicion standard use the same factors but require a less demanding showing than when applying a probable cause standard." *Payne,* 181 F.3d at 790. *See also United States v. Sokolow,* 490 U.S.

holds that the DEA agents lacked reasonable suspicion to seize and detain Defendants Figueredo-Diaz and Morales-Loya.

Because the agents did not have reasonable suspicion of illegal activity to detain Defendants Figueredo-Diaz and Morales-Loya, the DEA's seizure of these Defendants violated the Fourth Amendment. The Court holds that any evidence against Defendants Figueredo-Diaz and Morales-Loya seized as a consequence of the improper detention should be suppressed under the exclusionary rule. Although there is no per se rule requiring the suppression of evidence, "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."[47] The evidence shows that as a result of the detention, the agents brought in drug dogs and approximately one hour later discovered the narcotics underneath the tractor trailer. The Court finds that there is no evidence of attenuation or the interruption of intervening circumstances to remove the taint of the improper detention in this case.[48] Therefore, the Motions to Suppress of Defendants Figueredo-Diaz and Morales-Loya must be **GRANTED**.

## III.   Search of the Tractor-Trailer

Having concluded that the agents had reasonable suspicion to detain Defendant Rivas (but not Defendants Figueredo-Diaz and Morales-Loya), the Court next considers whether the search of the tractor-trailer was proper. An investigative detention "must be temporary and last

---

1, 9-10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). It follows that companionship or association can be a factor in determining reasonable suspicion.

[47] *Gross*, 624 F.3d at 317 (quoting *New York v. Harris,* 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990)).

[48] *See id.*

no longer than is necessary to effectuate the purpose of the stop."[49]  During a proper *Terry* stop,

the police must act with the purpose "to confirm or dispel [their original] suspicions quickly."[50]

To determine whether an investigative stop is "reasonably related to the basis for the original

intrusion," the Court must consider the length of the detention, the manner in which it is

conducted, and the degree of force used.[51]  Should the scope of the investigation exceed the

original purpose, a detention ripens into an arrest and must be supported by probable cause.[52]

The Court holds that Rivas' detention was sufficiently temporary, and the agents's use of

drug dogs was reasonably related to their investigation of Rivas's suspected drug activities.  The

record indicates that after Rivas fled and the remaining Defendants were detained, the officers on

the scene ran a narcotics canine named Marco over all of the vehicles on the property, including

the tractor trailer.[53]  Marco alerted to the scent of narcotics underneath the front of the trailer

---

[49] *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007) (citations omitted).

[50] *United States v. Freeman*, Nos. 08-5677, 08-5678, 2010 WL 4244268, at *9 (6th Cir. Oct. 19, 2010) (citing *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)).

[51] *E.g. United States v. Perez,* 440 F.3d 363, 372 (6th Cir. 2006) ("The investigative means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time.").

[52] *Smoak v. Hall,* 460 F.3d 768, 780-81 (6th Cir. 2006) (citing *United States v. Obasa,* 15 F.3d 603, 607 (6th Cir. 1994)).

[53] The Magistrate Judge concluded that Marco was a properly-trained narcotics detection dog.  Although Defendant Figueredo-Diaz has objected that Marco was not reliable, Defendant Rivas has not challenged this proposed holding.  Even so, the Court finds the challenge to Marco's reliability to be meritless. *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) ("The government need not produce actual certification records to establish the reliability of the dog; testimony about the dog's training and reliability suffices.") (citation omitted)).  The Magistrate Judge received testimony about Marco's training and reliability from his handler.  Therefore, any objection as to the reliability of Marco is overruled.

itself.  Based on Marco's positive alert, the police had probable cause to conduct a search of the trailer.[54]  The Court emphasizes that up to this point in the investigation, Defendant Rivas was still in flight and had yet to be detained.  Once Defendant was apprehended and Officer Hoing returned to the Old Highway 78 property, Hoing ran his drug canine Tex to search the interior of the trailer.  After Tex alerted to the scent of narcotics below the trailer floor, the agents drilled into the undercarriage of the trailer to discover the narcotics hidden within.  The Court finds that these additional investigative measures were reasonable in light of both dogs alerting for the scent of narcotics in the undercarriage of the trailer as well as Defendant Rivas' earlier inspection of this area.[55]  Thus, the Court concludes that the use of the drug dogs was the least intrusive means available to quickly verify or dispel the DEA's reasonable suspicions of Rivas' drug trafficking activities.

Furthermore, the Court finds that the duration of the investigation was no longer than necessary to effectuate the purpose of the detention.  Although there was no proof of the exact amount of time involved in the investigation, the Court finds that the length of the investigation was limited and reasonable under the circumstances.[56]  Importantly, Defendant Rivas eluded capture for approximately one hour.  In the meantime, Marco and his handler arrived at the scene and were there about thirty minutes before Marco had alerted on the trailer.  Once the officers

---

[54] *Freeman*, 2010 WL 4244268, at *9 (citing *United States v. Diaz,* 25 F.3d 392, 393-94 (6th Cir. 1994)).

[55] Officer Hoing testified that his earlier observation of Defendant Rivas inspecting this part of the trailer and the two alerts from the drug canines led to his suspicion that something was in the floor or undercarriage of the trailer.  Suppression Hr'g Tr. 47:23-48:3.

[56] *See Houston*, 174 F.3d at 815 ("There is no rigid time limit for a *Terry* stop.  When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate.") (citations omitted).

had probable cause to search the tractor trailer, they completed a search of the tractor cab and the

cargo hold of the trailer.  It appears that the officers had completed their search of these

accessible areas of the tractor trailer by the time Rivas was captured and Officer Hoing had

returned to the scene.[57]  In other words, the entire investigation up to that point took

approximately one hour.  More importantly, the detention of Defendant Rivas had not even

begun until the moment of his capture.[58]  Upon Officer Hoing's return to the scene, he deployed

his own narcotics dog Tex inside the trailer's hold.  Tex's alert led the agents to drill into the

undercarriage of the trailer and finally discover the narcotics to which the canines had alerted.

Because of Defendant Rivas' flight and the concealment of the narcotics in the undercarriage of

the trailer, the Court finds that the investigation was sufficiently temporary and limited in

duration.[59]

Defendant Rivas objects that the agents still had a duty to obtain a warrant prior to their

search of the tractor trailer.  Rivas argues that while Officer Hoing had enough time to assemble

his agents and request support from other law enforcement agencies, he could not explain why

---

[57] Officer Gibbs who was Marco's handler testified that he and Marco were at the scene no more than ninety minutes.  Suppression Hr'g Tr. 193:17-23.

[58] As discussed previously, Rivas was not seized and his detention did not begin until he actually submitted to the officers' show of authority.

[59] *See United States v. Howard*, 621 F.3d 433, 452 (6th Cir. 2010), *cert. denied*, 131 S.Ct. 1623 (2011) (finding *Terry* stop reasonable where canine sniff took no more than twenty minutes); *Freeman*, 2010 WL 4244268, at *9 (finding *Terry* investigation reasonable were canine check conducted twenty-three minutes after detention began); *Garcia*, 496 F.3d 495, 504 (finding *Terry* stop reasonable where the canine sniff occurred within thirty minutes of the stop); *Davis,* 430 F.3d at 354 (finding *Terry* detention of thirty to forty-five minutes reasonable to bring drug-sniffing dog to the scene); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (finding *Terry* detention reasonable where the entire investigation lasted less than one hour with approximately thirty-five minutes spent waiting for the canine unit to arrive).

he did not have time to obtain a warrant.[60]  The Court holds that the warrantless search was justified in this case.  The positive alert by two different drug dogs provided probable cause to conduct a warrantless search of the tractor trailer.[61]  The Court further agrees with the Magistrate Judge's proposed holding that the automobile exception to the warrant requirement would apply.[62]  In his Objections, Defendant Rivas does not seriously challenge the significance of the drug dog alert or the applicability of the automobile exception.  Rather Defendant maintains that his seizure amounted to an arrest without probable cause and that the canine sweep and the search of the trailer were conducted as part of his improper arrest.  The Court has already addressed this argument and rejected it, holding that there was no arrest and that the DEA had reasonable suspicion to detain Rivas and investigate further.  In short, the Court finds Defendant's Objections to be without merit.  Therefore, the Court **ADOPTS** this portion of the

---

[60] Defendant Rivas highlights Officer Hoing's testimony that "I do not believe that I probably had enough to get a warrant at that particular moment."  Suppression Hr'g Tr. 148:14-19.  The Court notes that the "particular moment" Officer Hoing referred to was the initial approach onto the property, not the search of the tractor trailer.  The Court has already analyzed the agents' initial approach and determined that the agents had reasonable suspicion to detain Defendant Rivas (but not Defendants Figueredo-Diaz and Morales-Loya).  As a result, the Court finds that Hoing's statement is not relevant to the issue of whether he had to obtain a warrant to search the trailer.

[61] *Perez,* 440 F.3d at 375 ("There is probable cause to justify a warrantless search of a vehicle once a properly trained and reliable drug detection dog alerts positively to the presence of drugs.").

[62] The Magistrate Judge cited in support *United States v. Navas,* 597 F.3d 492, 500 (2d Cir.), *cert. denied,* 131 S.Ct. 320 (2010) ("In reasoning otherwise, the district court suggested that, instead of performing the search, the agents were required to halt an ongoing investigation in order to wait at the scene and ensure that the trailer remained secure while a search warrant was obtained.  The Fourth Amendment does not necessitate such a course of action.  The agents had probable cause to conduct the search, and an automobile search is not unreasonable if based upon facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained*.") (citation and quotations omitted, emphasis in original)).

Report and Recommendation, and Defendant Rivas's Motion to Suppress is **DENIED**.

## IV.    Statements Made by Defendant Rivas

Defendant Rivas has objected that the Court should suppress any custodial statements given by him to police as fruit of the poisonous tree. Rivas' objection presupposes that his detention and the search of the tractor trailer were unlawful. The Court has rejected these premises and held that the DEA had reasonable suspicion to detain Rivas and that the search of the tractor trailer was proper. There is no basis then to suppress any of the statements Rivas made to police after his arrest. Therefore, the Court **ADOPTS** the relevant portion of the Report and Recommendation, and Defendant Rivas' Motion to Suppress his statements is **DENIED**.

## CONCLUSION

Having reviewed the transcript of the hearing before the United States Magistrate Judge and conducted a *de novo* review of the portions of the Report to which Defendants have objected, the Magistrate Judge's Report and Recommendation is **ADOPTED** in part, **REJECTED** in part. Defendant Emilio Rivas' Motions to Suppress are **DENIED**. Defendant Anibal Figueredo-Diaz's Motion to Suppress is **GRANTED**, and Defendant Dario Morales-Loya's Motion to Suppress is **GRANTED**.

      **IT IS SO ORDERED.**

                             **s/ S. Thomas Anderson**
                             S. THOMAS ANDERSON
                             UNITED STATES DISTRICT JUDGE

                             Date: April 26, 2011.